ED FINNERTY, Appellee, v. CHARLES SHADE, Appellant.

No. 39878.

January 21, 1930.

Rehearing Denied October 23, 1930.

*E. C. Roach,* for appellant.

*Fisher & Riter,* for appellee.

Evans, J.—The action was brought in March, 1927, by Ed

1340

Finnerty, who died on May 16th of the same year. Thereafter, his administrator was substituted as plaintiff. He averred, in substance, that, on April 7, 1923, he sold to the defendant, Shade, a certain $19,000 mortgage, at the agreed price of $13,000; that of such price he received the sum of $10,000, and no more; that Shade purported in the transaction to represent himself and one Harrison, who with Shade was a joint owner of the farm covered by the mortgage in question; that $7,000 of the purchase price was to be paid by the cancellation of two notes, amounting to $7,000, of which notes the plaintiff was maker, and the defendant, or his bank, was payee; that the balance, of $6,000, was to be paid by Shade or Harrison, "his co-owner;" that Shade did pay the sum of $3,000, and did say that Harrison would pay the remaining $3,000; that the plaintiff did then and there deliver said mortgage to said Shade, duly assigned to the First National Bank, of which Shade was president.

The answer of the defendant comprised a general denial, and specifically denied that the purchase price was to be the sum of $13,000. On the contrary, it was averred that the purchase price was to be $10,000, and that the same was then and there fully paid; that Harrison had no interest in the transaction, and was never mentioned therein. Such is the substance of the pleadings.

The evidence for plaintiff tended to show facts which may be briefly summarized as follows:

On March 1, 1919, the plaintiff conveyed a farm in Lyon County to one McLaughlin, and took back a purchase-money mortgage for $19,000, due in ten years from date, at 5 per cent interest, payable annually. The defendant was president and active manager of the First National Bank of Rock Rapids, and was likewise president of the Farmers National Bank of Inwood and the Savings Bank of Larchwood. Sometime after March, 1919, the defendant, Shade, and one Harrison became the joint owners, by purchase from McLaughlin, of the farm covered by the plaintiff's mortgage, which mortgage was assumed by the grantees in their deed. About 1921, the plaintiff became indebted to the defendant, Shade, or to the First National Bank, in the sum of $7,000, represented by two notes. He put up his $19,000 mortgage as collateral security therefor. In April, 1923, the plaintiff's notes became due, and payment was requested. They were then held by the Larchwood and Inwood banks. These were

the immediate circumstances which led up to the transaction of April 7, 1923. The vital dispute between the parties is whether the purchase price of the mortgage was to be .$13,000 or only $10,000. The mortgage was concededly good, and would be worth par on the date of its maturity. The only fact that depreciated its present value was the remoteness of its due date and its low rate of interest. The appellant has assigned several errors, some of which we deem minor ones. We think the one debatable question presented is whether the defendant was entitled to a directed verdict on his motion therefor at the close of all the evidence. Before taking up the discussion of that question, we will first dispose of the other alleged errors assigned.

I.  At the time of his death, the original plaintiff was a resident of Sioux Falls, South Dakota. He left surviving him his widow and his son, Tom Finnerty, as his only adult sur-vivors. Upon the application of the widow, the son, Tom, was appointed administrator of the estate of the deceased in Lyon County, Iowa. Thereupon, on motion, he was substituted as plaintiff in this action by order of the court. No resistance was offered to such substitution. After the substitution, however, the defendant moved to dismiss this action on the ground that the clerk of the district court had no power to appoint a nonresident as administrator of the estate. The motion, unverified, was submitted to the court upon its own averments, without other proof. It did, however, contain the following reference:

"The court is referred to the pretended appointment of the said Tom Finnerty in the matter of the estate of Ed Finnerty, being Probate No. 1505."

The court overruled the motion. The ground of the ruling does not appear. What facts were disclosed by the probate record referred to in the motion is not disclosed in this record. In argument here, the appellant contends that the clerk had no jurisdiction to appoint a nonresident as administrator, and that, therefore, the appointment was void. The appellant purports to rely for authority upon *Knight v. Moline, E. M. & W. R. Co.,* 160 Iowa 160; *McClure v. Bates,* 12 Iowa 77. These cited cases do not sustain the appellant's position. They go only to the

proposition that a foreign administrator cannot ordinarily sue in the courts of this state unless he be appointed in this state pursuant to our statute, Section 11894, Code, 1927. In the *Knight* case, cited, we did in fact allow a foreign administrator to maintain his action notwithstanding that he had not been appointed in this state. We need not stop to consider the reasons for that particular ruling. The son, Tom Finnerty, is not a *foreign* administrator. He was appointed in Lyon County, Iowa, either by the clerk or by a judge. Argument is predicated upon the fact of his nonresidence and upon the contention that the clerk had no power to appoint a nonresident. This argument is apparently predicated upon Section 11832, which affirmatively confers power upon the clerk to appoint "resident administrators." The argument seems to contend for an implication that the conferring of power to appoint "resident administrators" implies a prohibition against the appointment of a nonresident as administrator. It is urged in argument that only the court, and not the clerk, can appoint such. If this be so, the question is disposed of by Sections 11834 and 11836, whereby the clerk's order, in the absence of contest by a party aggrieved, becomes the full equivalent of an order by the court itself. Moreover, Section 11893 provides for administration to be "granted to any suitable person or persons."

Sufficient to say that there is no lack of power in the court to appoint a nonresident as an administrator in this state. Whether, in a given case, nonresidence be an influential fact, which should operate against the appointment, is a question to be determined always in the particular case. It may be added, furthermore, that the appellant had no standing as an aggrieved party by reason of the appointment made. He was not a beneficiary of the estate, and had no interest therein. *Chicago, B. & Q. R. Co. v. Gould,* 64 Iowa 343; *In re Estate of Stone,* 173 Iowa 371. We find no merit in appellant's contention at this point.

II. In this division we shall consider together two assignments of error. The first relates to the allowance of leading questions propounded to the original plaintiff, as a witness, and  the other relates to the introduction of the testimony of the widow of the decedent to the circumstances attending the taking of his testimony. It appears that the plaintiff, at the time

of bringing his action, was suffering from a serious malady, which resulted in his death a few weeks later. It was desired by his counsel to obtain his testimony. A stipulation was entered into for the taking of the same in the form of a deposition. It was agreed in the stipulation that all questions and answers should be subject to the same objection as if the witness were present in court upon the witness stand. The testimony of the plaintiff, as it appeared in such deposition, was unsatisfactory on its face; sentences therein were broken and unfinished; and several leading questions appeared therein, to which answer had been given by the witness. When the deposition was offered upon the trial, appropriate objections were interposed, including objections to leading questions. Thereupon, counsel for the plaintiff asked leave of the court to introduce testimony as to the circumstances under which the deposition was taken. This was permitted by the court, and such was taken before the court ruled upon the objections to leading questions. The evidence thus introduced simply disclosed the fact that the witness, though alert mentally, was very weak physically, and that he gave his testimony with difficulty. The facts thus disclosed were such as would have come under the observation of the court if the witness had been testifying in court. The facts which might thus be observed by the court were proper for its consideration in exercising its discretion as to the allowance of leading questions. We think it was fairly within the discretion of the court to permit the showing. There was nothing inflammatory in the testimony, and no fact disclosed which could fairly prejudice a jury. We think the court acted within its proper discretion, both in receiving the circumstances attending the taking of the deposition and in permitting the leading questions.

III. This brings us to the more important error assigned: Did the court err in overruling the motion of the defendant, made at the close of all the evidence?

The particular infirmity in the evidence of the decedent which the appellant stresses upon our attention is that it shows that the defendant, Shade, promised for himself only to pay

$3,000, and that as to the other $3,000, he promised only that Harrison would pay it. In order to discuss this question effectively, it becomes necessary for us to set forth sufficient of the testimony of the deceased plaintiff to indicate its general character and scope, and we set forth the following excerpts therefrom. On direct examination, he testified:

"I owed the bank [First National Bank of Rock Rapids] $7,000. My notes [the two before mentioned, making up the $7,000] were at the banks at Larchwood and Inwood. The notes came due about April, 1923. I could not pay the notes. When the notes for $7,000 came due, I told Shade [appellant] I could not pay them, and that I would sell that mortgage [$19,000 McLaughlin mortgage] at a big discount. He [appellant] wanted to know how much, and I told him. Told him I did not want all the money right away. He said: 'I will take it. I will give you $3,000,' and· Harrison was to give me $3,000, and he [appellant] was to cancel my notes for $7,000. Q. Just what arrangement did you have then? A. He [appellant] said that he would pay me $3,000 right away, and Harrison, he knew, was hard up, and didn't have the money, and I would have to wait on him [Harrison] awhile. Q. For the $3,000? A. Yes, for the balance, of $3,000. * * * Q. What was said about how much he [appellant] and Harrison would pay you? A. They were to pay me $3,000 apiece. * * * Q. Did you talk to Mr. Shade about paying the other $3,000? A. He talked to me once, here in Sioux Falls. Q. What did he say? A. He wanted to know how I was getting along; if I was able to hold my place. He got to telling me how hard times was with them down there, and how scarce money matters was, and he says as quick as they got straightened around, they would tend to that business. Q. What business? A. That is, that $3,000."

On cross-examination, he testified:

"Q. And he [appellant] said he was to pay you $3,000 and Harrison was to pay you $3,000? A. Yes. The deposit I got was what Shade paid me. * * * Q. Had you seen Shade between the time you assigned the mortgage and the time you

talked to him in Sioux Falls? A. Oh, yes, many times. Q. Nothing had ever been said about the $3,000 that you say was owing you during that two years? A. Well, no, only what he [appellant] told me at the time of the transaction. He [appellant] said not to worry. He said Harrison was hard up. That's what he [appellant] told me there in Sioux Falls, and when the deal was made in Rock Rapids [approximately two years before the conversation at Sioux Falls]. I did not ask Shade for the $3,000. I knew Mr. Harrison. Q. The only time you ever requested payment of the $3,000 that you say Shade [appellant] said Harrison was to pay, was there in Sioux Falls * * * about two years ago, and to Mr. Harrison last year? A. Yes. * * * Q. The only time you ever requested payment of the $3,000 [from appellant] that you say Shade [appellant] said Harrison was to pay, was here in Sioux Falls about two years ago, and to Mr. Harrison last year? A. Yes. Q. You didn't take any evidence from either Mr. Shade or Mr. Harrison to pay the $3,000 that was due? A. No, I did not. Q. And no time was fixed when it would be paid? A. No. Only just as quick as times got better, they would pay it. * * * Q. When you first had the transaction and assigned the mortgage, what he [appellant] said about paying what was coming to you was that he would pay $3,000 and Harrison would pay $3,000? A. Yes. Q. Then Shade [appellant] didn't agree to pay but $3,000? Is that right? A. That was right at that—, yes. Q. But he didn't say he [appellant] would pay it ever? A. Well, no, he [Shade] never * * * told me he would pay it. He [Shade, appellant] said Harrison would pay it, but Harrison was hard up, at the time.''

On re-direct examination:

''Q. Was there anything said by Shade to you at the time you talked to him at the Minnehaha County building about any balance coming to you? A. Yes. Q. Just what did he say? A. He wanted to know how I was coming, and getting along with my place. I told him I was just able to make both ends meet. 'Well,' he says, 'don't get excited. It has been hard with us. Money matters have been awfully scarce, but' he says, 'as quick as they pick up a little bit, we will tend to you.' That's what he said.''

On re-cross-examination:

"Q. He never at any time agreed or promised to pay you this $3,000 that he said Harrison would pay, did he? A. He said that—always talked this way; that they were hard up, and money was scarce at the bank. Q. But he didn't say he would pay it, ever? A. Well, no, he never came out personally and told me he would pay it. He said Harrison would pay it, but Harrison was hard up at the time. There was no time set for it to be paid. I never at any time asked him for writing or note showing that either he or Harrison were to pay this $3,000. Q. You never had any written statement about it, one way or the other? A. No, sir."

As a witness in his own behalf, Shade testified, in substance, that the purchase price agreed on was $10,000, and not $13,000; that Harrison had no part in the purchase; that his name was not mentioned in the transaction; that, in fact, he had no interest in the purchase, and has never had any such interest since that time.

The evidence discloses that Harrison knew nothing about it, and that he continued to pay interest on the mortgage to Shade, ever since the purchase. Under the undisputed evidence on both sides, there was never a moment when Harrison was actually liable to the plaintiff for any part of the purchase price.

From a perusal of the foregoing evidence it will be seen that the case presented is quite unique in some respects, and, as such, has its difficulties. We are divided in opinion as to the merit of the point raised by appellant. The discussion and conclusion of this opinion present the majority view. It will be noted from the foregoing evidence that Shade did not, in express terms, promise to pay the full purchase price. Neither did Harrison promise to pay the same. Shade did promise or represent that Harrison *would* pay the same. We are called upon to analyze the transaction and to discover its essential parts. Its subject-matter was the mortgage. The objective of the parties was the purchase and sale thereof. The first essential requisite was an agreement upon the price. If Finnerty's testimony is to be accepted as true, the price agreed on was $13,000. Needless to say that, for the purpose of the motion to direct the verdict, such testimony was to be taken as true. Likewise, the jury found the

same to be true, and we must assume it to be so. As against the defendant, we must also assume it to be true that Harrison had no interest in the transaction; that he never acquired any interest in the purchase, and was never in fact obligated to Shade that he would pay $3,000 of the purchase price; that Shade had no authority from Harrison to say that he would pay any part of the price; and that Shade never believed he had any such authority. The evidence of the plaintiff is clearly sufficient to justify a finding by the jury that the agreed purchase price was $13,000, and not $10,000. Concededly, only $10,000 has been paid. Who is liable to plaintiff for the balance of the purchase price? "Not I," saith the appellant, "because (1) I did not expressly promise to pay the same; (2) my only promise, proved by the testimony of appellee, was that *Harrison would pay the same.*" Therefore, the plaintiff must look elsewhere for recovery, under his own testimony. This is the crux of the argument. Was it essential that there should have been an express promise by Shade to pay the price? We have before us a mere oral contract. An oral contract may, and usually does, consist of mere conversation. The conversation may be deficient or redundant, or it may not occur at all. It is singularly true that oral contracts may be created without a spoken word. Oral contracts represent a large, if not the larger, part of all the daily business transacted in every city in the state. The daily output runs into thousands upon thousands of business transactions, and comprises purchases and sales of every variety. In that sense, the ordinary business community may be likened unto a serve-yourself-store. The seller exhibits his prices. The customer steps to the counter and selects the wares he wants and takes them into his custody. He has thereby entered into an oral contract, though no spoken word has passed between buyer and seller. The essentials of that contract are the scheduled price and the acceptance by the act of the purchaser. The implications of the law *formulate* the contract. The law implies a *promise,* and implies it conclusively, if the purchaser has taken the full consideration. The fact, therefore, that no *formal* or express promise to pay is made by the purchaser does not render the oral contract deficient or unenforcible. The implications of the law supply all the deficiencies of formality when it sufficiently appears, either by conduct or by language, that a purchase

was mutually intended and accomplished and the price was mutually understood.

In the case at bar, if the testimony of plaintiff is to be taken as true, the purchase price of the mortgage was mutually understood as $13,000; the purchase was mutually intended; the subject-matter was taken by the defendant, and has ever since been retained by him. The law, therefore, implies a purchase at the price mutually understood by the parties, notwithstanding that no formal promise to pay was ever made.

We pass, therefore, to the second ground of infirmity claimed by the appellant. This is that the infirmity of the contract, as disclosed by the evidence of the plaintiff, did not consist in the mere absence of a promise to pay; that, on the contrary, such evidence shows affirmatively that there *was* a formal promise to pay, to the extent of $3,000, and no more; that, as to the remaining $3,000, the only promise or representation made was that *Harrison would pay it*. The argument is that this statement operated as a restriction upon the liability of the defendant as a purchaser, pursuant to the oral contract. We are confronted at this point with an interpretation of the conversation. Was the statement of the defendant that Harrison would pay the remaining $3,000 to be deemed a restriction upon the liability of Shade, or was it to be deemed descriptive of the method of payment, or of the source from which the funds were expected? The natural implication of the defendant's conversation, as testified to by plaintiff, was that Harrison, who was a co-assumptor of the mortgage with the defendant Shade, was likewise interested in this purchase, and that the defendant was expecting him to furnish his share of the purchase price. If Shade and Harrison had both been present, participating in the contract, and if they had bargained in severalty with the defendant for the purchase of an undivided interest respectively in the mortgage, an entirely different question would be presented. And perhaps even in the absence of Harrison, if the defendant had been authorized to represent him, and to purchase an interest in the mortgage for him, and thereby to promise for him that he would pay a specified allotment of the purchase price, a different question would be presented. We have nothing of that kind before us. If the plaintiff had accepted from Harrison a promise to pay, in lieu of a promise by defendant to pay, we might have

before us a question of novation. There was no promise to pay by Harrison. There was a promise by *defendant* that Harrison would pay; but it develops that he had no authority to make such promise. Nor was there any consideration for such a promise moving to Harrison. According to defendant's testimony, Harrison had no interest in the deal.

The net result, therefore, of the terms of the conversation was that the agreed price was $13,000; that Shade said "I'll take it;" that he did take it, and has ever since retained it; that he formally promised to pay $3,000 of the $6,000 balance; that no one promised to pay the remaining $3,000. Upon this analysis of the evidence, the appellant contends that the plaintiff failed to prove his contract; that, if he has any remedy, it must be on some other ground than that pleaded.

Suppose that our customer at the serve-yourself-store, after gathering his wares into his arms, had said to the proprietor: "I will now pay you one half of this purchase, and my partner will be in shortly, and will pay you the other half." Suppose, further, that the proprietor should say, "All right." Suppose that it should develop later that the alleged partner had no interest in the purchase, and that he did not, and would not, pay any part of the price. Would the obligation of the original purchaser to pay the full purchase price be avoided or diminished in any degree by his mistaken representation that his partner would pay it? Would the fact that the proprietor had assented to the purchaser's statement, and had, in effect, agreed to accept payment from the alleged partner, lift from the purchaser his original obligation to pay the whole?

The appellant contends for the affirmative on this question. The argument is that the implied agreement by the purchaser to pay the whole price was qualified by the agreement of the seller to accept a part of the purchase money from another source; that, if the seller was induced to give his assent to such a course by the fraud or false representation of the purchaser, then the seller must sue for the fraud which induced the modification of the agreement; that the plaintiff has not alleged fraud; that he cannot recover for fraud, for want of allegation; and that he cannot recover upon the implied agreement entering into the original purchase, because he agreed to a qualification thereof, in that he agreed to look to Harrison for the rest of the price.

As before indicated, this argument puts an interpretation upon the conversation and the legal effect thereof which is not a necessary interpretation, nor, in our judgment, a rational one. Quite apart from all that, the patent fallacy of the argument is the assumption that, if Shade was guilty of fraudulent representation in inducing Finnerty to believe that Harrison would pay him $3,000, then the plaintiff's *only* remedy would be to sue for damages for fraud. Granted that the plaintiff could have predicated an action for damages upon alleged fraud, he was not legally required to pursue that course. He had an equal right to ignore or to waive the fraud, and to sue on his contract. We hold that the false or mistaken representation by the defendant that Harrison would pay $3,000 of the purchase price did not, in legal effect, diminish in any degree the obligation of the defendant himself to pay the full purchase price.

IV. Error is assigned upon that feature of the court's instructions which permitted the jury to award recovery to the plaintiff not only for the principal sum but for interest thereon as well. The basis for this contention is the testimony for plaintiff that he had consented to delay in the final payment. It is argued that interest could not begin to accrue until the payment was due. The evidence of plaintiff shows that Shade asked for sufferance for Harrison because he was "hard up at that time." Whether, in any event, such an assent to mere sufferance would be legally effective to stop the accrual of interest, *quaere*.

Inasmuch as the purported connection of Harrison with the transaction is disclosed to have been purely fictitious, we are holding that what was said concerning Harrison could not be effective to diminish in any degree the obligation of the defendant Shade to pay the full purchase price. For the same reason, the same fiction is equally ineffective to diminish to any degree the obligation of Shade to pay interest on the price. He asked for no sufferance for himself. There was no error, therefore, in allowing recovery of interest, as well as of principal.

The judgment below is, accordingly,—*Affirmed.*

MORLING, C. J., and STEVENS, FAVILLE, and ALBERT, JJ., concur.

KINDIG, DE GRAFF, WAGNER, and GRIMM, JJ., dissent.

KINDIG, J., (dissenting).—I dissent from Division III of the majority opinion on the theory that Finnerty sought to recover on, and proved, an express contract, under which Harrison, and not Shade, was to pay the $3,000 in controversy. It seems to me that the majority entirely disregard the distinction between express and implied contracts. They also ignore the underlying principles of procedure which distinguish between a declaration upon an implied contract and one upon an express agreement.

Every day in the business world, oral contracts are made. These undertakings are just as sacred as written compacts. While, in making interpretations of conversations involved in oral contracts, it may be permissible for the courts to proceed upon the theory that men do not always remember, and therefore the one contender, rather than the other, is to be believed, yet that principle will not permit us to go so far as to say that we may disregard an express agreement, even though verbally made, and permit a litigant to recover upon something entirely different, which was not testified to by any witness. An oral contract, as well as one in writing, may be express. This doctrine is recognized by courts, textbooks, and encyclopedias. For illustration, it is said in 6 Ruling Case Law 587, Section 6:

"But, as ordinarily understood, the only difference between an express contract and a contract implied in fact is that in the former the parties arrive at their agreement by words, either *oral* [italics are ours] or written, * * * while in the latter, their agreement is arrived at by a consideration of their acts and conduct."

Likewise, a similar expression is made in 13 Corpus Juris 240, Section 6, where this language is used:

"An express contract is one where the intention of the parties and the terms of the agreement are declared or expressed by the parties, in writing or *orally* [the italics are ours], at the time it is entered into."

Those fundamental rules of law should be recognized and applied. To disregard them is to cause confusion and uncertainty, which, in time, must necessarily interfere with business transactions everywhere. On the theory of those well established principles, a review of the case at bar will now be made.

Contained in the appellee Finnerty's petition is the allegation "that the said Charles Shade [appellant]" or Harrison, aforesaid, agreed to pay appellee's intestate $3,000 deferred payment. Everything else, it is parenthetically noted, had already been paid by the appellant, Shade. Thus, according to the allegation aforesaid, the statement is in the alternative. (Whether such pleading is sufficient is a subject not before the court.)

Consistent with the allegation contained in the petition, the district court presented to the jury the duty of determining whether, under the evidence as alleged by appellee, Finnerty, "said Charles Shade [appellant] or Harrison, aforesaid, agreed to pay appellee's intestate the $3,000 deferred payment." Support for the alternative issue, so far as it relates to the appellant Shade's agreement, must be found, if at all, in the testimony of Ed Finnerty. An analysis thereof reveals the following statements concerning the alleged oral contract:

"I owed the bank [First National Bank of Rock Rapids] $7,000. My notes [the two before mentioned, making up the $7,000,] were at the banks at Larchwood and Inwood. The notes came due about April, 1923. I could not pay the notes. When the notes for $7,000 came due, I told Shade [appellant] I could not pay them, and that I would sell that mortgage [the $19,000 McLaughlin mortgage] at a big discount. He [appellant] wanted to know how much, and I told him I did not want all the money right away. He said: 'I will take it. I will give you $3,000,' and Harrison was to give me $3,000, and he [appellant] was to cancel my notes for $7,000. Q. Just what arrangement did you have then? A. He [appellant] said that he would pay me $3,000 right away, and Harrison, he knew, was hard up, and didn't have the money, and I would have to wait on him [Harrison] awhile. Q. For the $3,000? A. Yes, for the balance, of $3,000. * * * Q. What was said about how much he [appellant] and Harrison would pay you? A. They were to pay me $3,000 apiece."

Such was the material part of the witness's testimony on direct examination. Then he continued, upon cross-examination, in this way:

"Q. And he [appellant] said he was to pay you $3,000 and

Harrison was to pay you $3,000? A. Yes. The deposit I got was what Shade paid me. * * * Q. Had you seen Shade between the time you assigned the mortgage and the time you talked to him in Sioux Falls? A. Oh, yes, many times. Q. Nothing had ever been said about the $3,000 that you say was owing you during that two years? A. Well, no, only what he [appellant] told me at the time of the transaction. He [appellant] said not to worry. He said Harrison was hard up. That's what he [appellant] told me there in Sioux Falls [about two years after the original contract was made], and when the deal was made in Rock Rapids [approximately two years before the conversation at Sioux Falls]. *I did not ask Shade for the three thousand. I knew Mr. Harrison.* [The italics are ours.] Q. The only time you ever requested payment of the $3,000 that you say Shade [appellant] said Harrison was to pay, was there in Sioux Falls * * * about two years ago, and to Mr. Harrison last year? A. Yes.''

Manifestly, when the record is construed most favorably for appellee, there is not a word in that testimony that can fairly and conscientiously be said to support any agreement whereby appellant undertook the payment of the remaining $3,000. Harrison, if anyone, was to discharge that obligation. Not only once, but repeatedly, appellee's intestate affirms and reaffirms that Harrison, and not appellant, was to pay the money in suit. Parenthetically, it is here noted that this is not an action to recover from appellant because: First, of fraud in misrepresenting his right to represent Harrison; second, because the right to represent Harrison did not exist; third, of quasi contract, based upon unjust enrichment; or fourth, of any other theory except an ordinary suit on an express oral contract.

It is fundamental that a contract is based upon an offer and an acceptance. There must be a meeting of minds. Otherwise there is no agreement. Applying that well-known principle to the evidence in this record, it is very plain that appellant never agreed to pay appellee's intestate the $3,000 now claimed. Whatever undertaking existed in that respect was imposed upon Harrison, so far as regards appellant's consent. Also, appellee's intestate intended, according to the evidence, not that appellant would discharge this obligation, but that Harrison would do so.

Where, then, did the minds meet? Certainly not upon a contract wherein appellant was to assume the burden of this debt. Neither appellant nor appellee's intestate intended that. Each mind met upon the proposition that Harrison would assume the liability for the $3,000. Clearly, then, that must have been the contract, if any at all existed in this respect. There was nothing upon which the jury could base any other finding. The whole theory of the trial was upon that idea. Fraud, misrepresentation, false warranty, quasi contract, or any other doctrine, was not pleaded, proved, or relied upon. If one contract is relied upon, another cannot be proven. Hence, in the case at bar, there was nothing in the record for submission to the jury concerning appellant's liability for the $3,000 which, under the alleged agreement, Harrison was to pay, because, construing the evidence in that regard in its most favorable light for appellee, it is plain and uncontradicted that the latter's intestate described a contract wherein Harrison, and not appellant, Shade, was to be obligated for the deferred payment. Resultantly there was nothing for the jury's consideration; for, having thus proven that Harrison, if anyone, is liable, appellee cannot recover against appellant, Shade, under the contract which was pleaded and submitted to the jury.

When reaching the above and foregoing conclusion, full consideration has been given to the testimony of the appellant, Shade, and especially that part thereof wherein he replies to the proposition of sale made by the said Ed Finnerty. After the sale was proposed, Shade is alleged by Finnerty to have said: ''I will take it.'' Take what? Manifestly, the proposition outlined by Finnerty, which was that Shade, after satisfying the $7,000 indebtedness, would pay Finnerty $3,000, and Harrison would pay the other $3,000. It must be remembered that Finnerty was there himself, stating the conversation. Shade does not claim that was the conversation. The latter contends that he agreed to pay $10,000 for the note, and no more. Finnerty urges that he was to receive another $3,000, but in the testimony he emphatically declares that Harrison was to pay it. Under the evidence, the jury could find nothing more than Finnerty's version of the conversation, because Shade disputes Finnerty in reference to the $3,000 in controversy. Shade says that he never agreed to pay said $3,000, and Finnerty himself stated that Harrison was

to pay it. Then it is clear that there was nothing upon which a jury could say that Shade ever agreed to pay it, for neither Shade nor Finnerty claimed that Shade was to pay this sum. Finnerty says Harrison was to pay it, and Shade declares no one was to assume the obligation. So, appellee proved that Harrison, and not Shade, was to pay the $3,000. The contract was express. Forsooth, appellant was absolved from responsibility.

Under those circumstances, well established rules of law and procedure bar appellee's recovery. Analogous authorities are: *Petersen v. Ochs,* 40 Iowa 530; *York v. Wallace,* 48 Iowa 305; *Proctor v. Reif,* 52 Iowa 592; *Duncan v. Gray,* 108 Iowa 599; *Shambaugh v. Current & Sanderson,* 111 Iowa 121; *Roundy & McMurray Co. v. Nicholson Prod. Co.,* 166 Iowa 39; *Bierkamp v. Beuthien,* 173 Iowa 436; *Hankins v. Young,* 174 Iowa 383; *Roche v. Star Land Co.,* 176 Iowa 34; *Quillen v. Minneapolis & St. L. R. Co.,* 181 Iowa 536; *Globe Indemnity Co. v. Anderson-Deering Co.,* 200 Iowa 1035; *Bremhorst v. Phillips Coal Co.,* 202 Iowa 1251; *Olson v. Shuler,* 203 Iowa 518.

Appellee, if he relies upon some other theory, must plead and prove it. Adjudicated cases, stretching over the years, and requirement of orderly procedure in courts of law, make this absolutely necessary. Some support is found by the majority to sustain the contract pleaded, through a conversation alleged to have been had at Sioux Falls, South Dakota, between appellant and appellee's intestate, about two years after the McLaughlin mortgage had been sold, under the transaction aforesaid,—that is to say, two years after the alleged contract was entered into. Preliminary to a discussion of this fact, it will elucidate to note that no one claims a novation, modification, or an additional agreement. Of course, whatever the contract may have been, it was fully completed and final in April, 1923. Later conversations might confirm that agreement or prove its existence, but could not, under the circumstances, enlarge or change it. The Sioux Falls conversation, as shown by the record, was:

"Q. The only time you ever requested payment of the $3,000 [from appellant] that you say Shade [appellant] said Harrison was to pay, was here in Sioux Falls, about two years ago, and to Mr. Harrison last year? A. Yes. Q. You didn't take any evidence from either Mr. Shade or Mr. Harrison to

pay the $3,000 that was due? A. No, I did not. Q. And no time was fixed when it would be paid? A. No. Only just as quick as times got better, they would pay it.''

Obviously, the inference contained in the last answer cannot change or amend the original contract. Two years, it must be remembered, had transpired. Following that testimony, however, appellee's intestate explained his evidence, so as to exclude any idea that appellant, Shade, had originally undertaken or later assumed the obligation of Harrison. Reference is made to the following record on redirect examination:

''He [Harrison] said that Shade [appellant]never told him anything about it [the transaction here involved], and that he [Harrison] didn't feel like paying $3,000 until he knew what became of the mortgage. That's all he [Harrison] said about it.''

Continuing, then, on re-cross-examination, appellee's intestate reaffirmed his original testimony in this way:

''Q. When you first had the transaction and assigned the mortgage, what he [appellant] said about paying what was coming to you was that he would pay $3,000 and Harrison would pay $3,000? A. Yes. Q. Then Shade [appellant] didn't agree to pay but $3,000? Is that right? A. That was right at that—, yes. Q. But he didn't say he [appellant] would pay it ever? A. Well, no, he [Shade] never * * * told me he would pay it. He [Shade, appellant] said Harrison would pay it, but Harrison was hard up at the time.''

To begin with, this Sioux Falls conversation, as before related, took place two years after the alleged contract was consummated. Therefore, under no stretch of the imagination could this belated conversation have become a part of the original contract, under the facts here presented. Even appellee concedes that, whatever the agreement was, the same was completed at the original conversation, which occurred two years before the Sioux Falls transaction. Modification of the original contract is not alleged or proven. Consideration for a new contract in no event appears, and, as just stated, contention that there was novation or modification is not made. Furthermore, the Sioux

Falls conversation, when considered as a whole, in the light of Finnerty's entire testimony, including his cross-examination, supports and confirms, rather than minimizes, appellant Shade's theory of the contract; because both conversations, as related by Finnerty, indicate that Harrison, and not Shade, was to pay the $3,000. There is no place here for an implied agreement, for such implication has no place either in the pleadings or the proof.

Because the appellee did not prove the contract pleaded, I would reverse the judgment of the district court.

DE GRAFF, WAGNER, and GRIMM, JJ., join in the dissent.